IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRUCE D. CHURCHILL,<br>ROSE L. CHURCHILL,<br><br>          Plaintiffs,<br><br>   vs.<br><br>UNITED STATES OF AMERICA,<br><br>          Defendant.<br>_____/ | CASE NO. CV F 09-1846 LJO JLT<br><br>**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** (Doc. 40) |

By notice filed on April 12, 2011, defendant United States of America ("defendant") moves for summary judgment pursuant to Fed.R.Civ.P. 56 on the cause of action for medical malpractice. Plaintiffs Bruce D. Churchill and Rose L. Churchill ("plaintiffs") filed an opposition on April 26, 2011. (Doc. 41.) Defendant filed a reply brief on May 4, 2011.  Pursuant to Local Rule 230(g), this matter is submitted on the pleadings without oral argument.  Therefore, the hearing set for May 11, 2011 is VACATED. Having considered the moving, opposition and reply papers, as well as the Court's file, the Court issues the following order.

## BACKGROUND

**A.     Overview of Plaintiff's Medical Condition**

Plaintiff Bruce Churchill alleges that he is entitled to damages for the alleged medical malpractice of nursing employees of the VA Central California Health Care System facility located in Fresno, California ("VA hospital").  Plaintiff Rose Churchill is seeking damages for loss of consortium.

Bruce Churchill was an inpatient at the VA hospital between April 8, 2008 and April 21, 2008. He was examined and treated for chest pain, a possible myocardial infarct and the effects of Hepatitis

C. Mr. Churchill alleges he was injured by the placement of a constrictive tourniquet-like bandage by the nursing staff on his right arm. During the course of his hospitalization, the constrictive tourniquet was left on for several days. The tourniquet-like bandage caused serious and permanent injuries to his right arm, including multiple blood clots, compartment syndrome, compressive nerve injury and severe pain and neuroproxia.

**B.     Procedural Issues with Expert Disclosures**

The complaint was filed in this matter on October 21, 2009. A Scheduling Order was entered on March 31, 2010 setting initial expert disclosure deadline for September 10, 2010. Plaintiffs made their Rule 26 initial disclosure on April 29, 2010, naming Harvey Lawrence Edmonds, M.D., as a medical expert witness, and attaching his November 30, 2008 IME report ("IME report").[1] Magistrate Judge Thurston extended the expert disclosure date to October 10, 2010 and ordered supplemental experts reports to be filed by November 11, 2010. Plaintiffs untimely filed their expert disclosures, and defendant successfully moved to strike plaintiffs' experts. Magistrate Judge Thurston struck plaintiffs' experts with the exception of Harvey Lawrence Edmonds and his November 30, 2008 IME report. Thus, plaintiffs' sole medical expert is Dr. Edmonds.

Defendant contends that Dr. Edmonds' report does not establish the applicable standard of care, does not state defendant's alleged deviation from that standard, or relate the causation of any injury. Defendant contends Dr. Edmonds did not opine as to the standard of care for Plaintiff Bruce Churchill's condition during his hospitalization, did not opine that the care provided by the VA hospital was inconsistent with the standard of care, or that Bruce Churchill had suffered any injury due to a deviation from the appropriate standard of care.

## ANALYSIS AND DISCUSSION

**A.     Summary Judgment/Adjudication Standards**

F.R.Civ.P. 56(b) permits a "party against whom relief is sought" to seek "summary judgment on all or part of the claim." Summary judgment/adjudication is appropriate when there exists no genuine

---

[1] Both parties acknowledge that the expert designation should have named "Harvey Lawrence Edmonds," and both parties agree that the initial designation inadvertently designated the name "Edwards" in place of the correct name "Edmonds."

2

issue as to any material fact and the moving party is entitled to judgment/adjudication as a matter of law. F.R.Civ.P. 56(c); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986). The evidence of the party opposing summary judgment/adjudication is to be believed and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

To carry its burden of production on summary judgment/adjudication, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895 F.2d at 574. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160, 90 S.Ct. 1598 (1970). "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d at 574. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make the showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial.")

"But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

**B.    The Claim for Professional Malpractice**

The elements a plaintiff must prove for a negligence action based on medical malpractice are: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." *Johnson v. Superior Court*, 143 Cal.App.4th 297, 305, 49 Cal.Rptr.3d 52 (2006); *Hanson v. Grode*, 76 Cal.App.4th 601, 606, 90 Cal.Rptr.2d 396 (1999) (same).

**1.    The Parties' Arguments regarding the Expert Report**

Defendant argues that Dr. Edmonds' IME report does not establish the applicable standard of care, the alleged deviation from that standard, or causation of any injury. Defendant argues the only expert testimony is the November 2008 IME report, which nowhere sets out an opinion as to the applicable standard of care or the other necessary elements with regard to any aspect of Bruce Churchill's treatment.

Mr. Churchill argues that Dr. Edmonds' report is sufficient to set forth the elements.[2] Mr. Churchill argues that the IME report is a detailed report of Dr. Edmonds' findings of the duty owed to

---

[2] Plaintiff offers that Dr. Edmonds expert in the field of Neurology. Dr. Edmonds is a physician and certified by the American Board of Psychiatrist and Neurology. He is trained, experienced and served as in various committees for medicine quality management at St. Agnes Medical Center. (Doc. 41-3, Edmonds Decl. and curriculum vitae.) In defendant's moving papers, defendant did not object to Dr. Edmonds' expertise. In their reply brief, however, defendant argues, "Plaintiff have not even established that Dr. Edmonds, a neurologist, is competent to address issues relating to nursing practices and the standard of care applicable to other nurses." (Doc. 42, Reply p. 7.) As noted, there has not been any objection in this motion to Dr. Edmonds' qualifications. The Court does not consider issues raised for the first time in a reply. *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir.1990).

Mr. Churchill, the standard of care, the deviation from the standard of care and the causation of injury. In a declaration filed in opposition to the motion, Dr. Edmonds explains his report. Dr. Edmonds notes that in his report he stated, "Unfortunately, it does not appear that the pressure dressing was <u>carefully observed</u> and significant swelling developed, causing a tourniquet-type effect." (Doc. 41-3, Decl. Edmonds ¶18, citing IME report (emphasis added).) In his declaration, Dr. Edmonds explains, "The plain meaning of my statement is that the standard of care for the application and monitoring of pressure dressings under the circumstances requires careful observation. The Fresno VA Hospital nursing staff failed in their duty to remove the coban wrap at 12:45 p.m. on April 11, 2008, as instructed, and thereafter failed to carefully observe and monitor the PICC line site, thereby breaching the standard of care, and causing injury in the form of pain, swelling, bruising, and the formation of blood clot (phlebothrombosis) of the basilic vein and the ulnar vein in the right upper extremity." (Doc. 41-3, Decl. Edmonds ¶ 18.)

In addition, plaintiff notes that the medical records from his hospital stay admit negligence. Records prepared by Dr. Christine Boehringer and Dr. Ivy Darden, indicate that the nursing staff improperly left the tourniquet-like pressure bandage on Mr. Churchill's arm. For example, Dr. Boehringer's notes indicate that plaintiff's arm swelling was "probably from tourniquet left on - at least in lower arm." (Doc. 41-3, Edmonds Report App. A (review of medical records). ) Dr. Darden's notes indicate "I informed him . . . that we had erred in leaving the compression dressing on his arm as long as it was, and that that may have contributed to his DVT and apologized." *Id.*

**2.      Identifying the Standard of Care**

Defendant argues that Dr. Edmonds does not state a standard of care.

"The standard of care in a medical malpractice case requires that medical service providers exercise ... that degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances." *Barris v. County of Los Angeles*, 20 Cal.4th 101, 108 n. 1, 83 Cal.Rptr.2d 145, 972 P.2d 966 (1999), *cert. denied*, 528 U.S. 868 (1999). "Because the standard of care in a medical malpractice case is a matter 'peculiarly within the knowledge of experts,' expert testimony is required to 'prove or disprove that the defendant performed in accordance with the standard of care' unless the negligence is obvious to a layperson." *Johnson*, 143 Cal.App.4th at 305. The usual

rule that a plaintiff's medical malpractice action must be supported by some expert evidence as to the proper community standard of care. *Meier v. Ross General Hospital*, 69 Cal.2d 420, 429-431, 71 Cal.Rptr. 903, 445 P.2d 519 (1968). "California courts have incorporated the expert evidence requirement into their standard for summary judgment in medical malpractice cases. When a defendant moves for summary judgment and supports his motion with expert declarations that his conduct fell within the community standard of care, he is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence." *Hanson*, 76 Cal.App.4th at 607. Thus, the expert must opine upon the prevailing standard of skill and learning in the same or similar locality and the propriety of a particular conduct.

### 3. Standard of Careful Observation

Here, the Court is not presented with affirmative evidence that the nurses' treatment of Mr. Churchill met the standard of care. Defendant does not come forward with its own expert to state that the nursing care provided to Mr. Churchill met the standard of care. There is no evidence that the nurses' application and changing of the bandage fell within the standard of care. Rather, defendant's position is that plaintiffs lack evidence of the standard of care in the community. (Doc. 40-1, Defendants P&A p.8.) Therefore, the Court must decide if the evidence before it raises an issue of fact as to the standard of care, breach of that standard and causation.

Plaintiff argues that the IME report of Dr. Edmonds and his declaration indicate a standard of care: "adherence to the standard of care in the application and monitoring of pressure dressing requires 'careful observation.'" (Doc. 41-2, Opposition p.14.) Plaintiff argues that the nurses at the VA hospital "did not carefully observe and monitor the status of the coban pressure dressing that was wrapped occlusively around the elbow area of Bruce Churchill's right arm." (Doc. 41-2, Opposition p.14.)

In viewing the evidence in the light most favorable to plaintiff, Mr. Churchill has carried his burden to present expert evidence as to a standard of care. Dr. Edmonds arguably states a standard of "careful observation." His IME report does not state, in the precise words, that the "standard of care requires 'careful observation,'" but a reasonable inference from the report is that careful observation is the standard of care. Dr. Edmonds states:

> "The operator placing the PICC line observed that there was oozing from both the sites of the first unsuccessful catheter placement, as well as the apparently successful placement of the PICC line. Accordingly, a pressure dressing was applied. **Unfortunately, it does not appear that the pressure dressing was carefully observed** and significant swelling developed, causing a tourniquet-type effect." (Doc. 40-4, IME Report p.12 (emphasis added).)

Dr. Edmond's IME report reviews in detail the medical records of Mr. Churchill's care at the VA hospital and discusses the following categories of information: Mr. Churchill's description of his injury and complaints, past medical history, physical examination, review of a pain questionnaire, and a multiple-page discussion, diagnostic impression, and future medical care. (Doc. 41-3, Edmond Decl. Exh. A.) He opines that "unfortunately" the pressure bandage was not "carefully observed."

Defendants argue that the "2008 Edmonds Report does not set forth the standard of care for nurses in connection with the medical issues that confronted Bruce Churchill in April 2008." (Doc. 42, Reply p.7.) While the IME report does not list "careful observation" as the standard of care, a reasonable inference is that this language states the standard of care. Once such an implication is made, an inference can be drawn, and in the ordinary course of Federal procedure, depositions generally fill in the details of such expert's opinions. Indeed, in a summary judgment motion, the court is to believe the non-moving party's evidence and draw all reasonable inferences. *Anderson v. Liberty Lobby,* 477 U.S. at 255. A reasonable inference from the IME report is that careful observation is required by the nursing staff. There is no dispute but that Dr. Edmonds is qualified to render an opinion as to neurological problems associated with the injuries in this case, or that he had the foundational information to opine as to the standard of care. This standard is corroborated by Dr. Edmonds' declaration wherein he explains what he meant by the language "carefully observed." (Doc. 41-3, Edmonds' Decl. ¶18.) He states the "plain meaning of my statement is that the standard of care for the application and monitoring of pressure dressings under the circumstances requires careful observation." *Id.* Given the circumstances here, the application of a pressure bandage, a reasonable inference from the IME Report is that the standard of care requires "careful observation."

Defendant argues that the Court should disregard Dr. Edmonds' declaration in its entirety. Defendant argues that the declaration is replete with new opinions and information, which are disclosed long after the discovery designation and deadline. Defendant argues that the declaration violates Rule

26(a)(2). Defendant argues that Mr. Churchill is limited to Dr. Edmonds' IME report: "On February 7, 2011, Plaintiffs were advised that the only expert witness whose testimony could be used at trial was the 2008 Report of Dr. Edmonds." (Doc. 42, Reply p.9.) Thus, defendant argues plaintiff is limited to statements in Dr. Edmonds' IME report.

The Court notes, however, that Magistrate Judge Thurston's order striking plaintiffs' other experts, did not restrict plaintiffs solely to the IME report. Rather, Magistrate Judge Thurston struck all experts except Dr. Edmonds, and required that he be made available for deposition. Plaintiffs offered Dr. Edmonds for deposition, which offer defendant declined. (Doc. 41-4, Smith Decl. A, B.) An expert is not precluded from testifying particularly when he has been offered for deposition. Thus, plaintiffs are not limited to the statements in the IME report, and Dr. Edmonds is not precluded from providing oral testimony in conjunction with this case.[3]

For purposes of this motion, the Court must give all reasonable inferences to plaintiffs' evidence. Mr. Churchill has presented expert evidence of a standard of care for nursing care of "careful observation." Since defendant's position in this motion is that plaintiff has not identified any standard of care, the motion must be denied on this point.

### 4. Causation[4]

Defendant argues that plaintiffs cannot establish the element of causation. (Doc. 40-1, Moving papers p. 8.) Defendant argues that Dr. Edmonds fails to opine that any aspect of the treatment provided by the VA was the cause of any specific injury to Mr. Churchill. Defendant argues, "At best Dr. Edmonds stated that there was some medical probability that Plaintiff had some neuroproxia, but does not tie that to any negligent treatment by the VA." He indicated there was "some evidence" of an

---

[3] This is not to say that Dr. Edmonds will be permitted to testify as to a standard other than "careful observation," coupled with whatever opinions are expressed in his report.

[4] In defendant's reply, defendant attacks another element of the malpractice cause of action. Defendant attacks the "breach" of the duty of care. Defendant argues that "[n]owhere does the report state that the VA nurses were negligent, or that as a result of that negligence Plaintiff Bruce Churchill was injured." (Doc. 42, Reply p.8.) The Court does not address this element because it is argued for the first time in Reply. Defendant's moving papers argued the lack of evidence for the elements of the (1) standard of care and (2) causation. (Doc. 40-1, Moving papers p. 7, 8.) While mentioned as a challenged element, defendant did not present argument on the element of "breach of the standard of care." New issues cannot be raised for the first time in a reply brief. Nonetheless, an issue of fact exists as to the breach. (See Doc. 41-1, Disputed facts # 15.)

8

additional neurological problem, but indicated that further testing was necessary to confirm such a diagnosis. Defendant argues that the IME Report does not "unequivocally establish that Bruce Churchill was injured" as a result of the nursing staff negligence. (Doc. 42, Reply p.8.)

Plaintiff argues that Dr. Edmonds' IME report enumerates a long list of injuries caused by the failure of the nursing staff to monitor carefully the status of the pressure bandage that was wrapped around Mr. Churchill's right arm, which resulted in the tourniquet-like effect. (Doc. 41-2, Opposition p.15.) Plaintiff argues that the IME report, Dr. Edmonds' declaration, and the medical notes of Dr. Boehringer and Dr. Darden establish that Mr. Churchill was injured as a result of the VA nursing actions.

In a medical malpractice action, a plaintiff must prove the defendant's negligence was a cause-in-fact of injury. *Jennings v. Palomar Pomerado Health Systems, Inc.*, 114 Cal.App.4th 1108, 1118, 8 Cal.Rptr.3d 363, 369 (2003). "A person who qualifies as an expert may give testimony in the form of an opinion if the subject matter of that opinion 'is sufficiently beyond common experience that the opinion of [the] expert would assist the trier of fact.' [Citations.] It is undisputed that qualified medical experts may, with a proper foundation, testify on matters involving causation when the causal issue is sufficiently beyond the realm of common experience that the expert's opinion will assist the trier of fact to assess the issue of causation." *Id.* at 1116-1117. The *Jennings* court stated that "the plaintiff must offer an expert opinion that contains a reasoned explanation illuminating why the facts have convinced the expert, and therefore should convince the jury, that it is more probable than not the negligent act was a cause-in-fact of the plaintiff's injury." *Jennings*, 114 Cal.App.4th at 1118.

There is sufficient expert evidence from which a jury could conclude that the pressure bandage caused Mr. Churchill's injuries. The medical records from the treating physicians at the VA indicate the cause of his injuries. Dr. Boehringer states that Mr. Churchill had "significant right upper extremity swelling with deep venous thrombosis," from "prolonged bandaging of the right upper extremity" because of "occlusive bandaging of right upper extremity." Dr. Boehringer states that the "tourniquet placement, which had inadvertently been left on the patient from the afternoon prior and noticed the following morning," left Mr. Churchill with "significant right upper extremity hematoma." Dr. Darden states that the pressure dressing contributed to deep venous thrombosis: "I informed him . . . that we had

erred in leaving the compression dressing on his arm as long as it was, and that that may have contributed to his DVT and apologized." Thus, the medical records from the VA, giving all reasonable inferences to plaintiff, show the cause of this harm was the pressure bandage.

Defendant argues that Dr. Ivy and Dr. Darden do not support causation because "at the time of Mr. Churchill's hospitalization, Dr. Ivy Darden believed, based on what she had been told by others, that the bandage 'may have contributed' to the formation of his blood clots." (Doc. 42, Reply p.3.) Defendant argues that "neither doctor offered enough information to allow the Court to draw a conclusion as to whether the bandaging was appropriate or whether the blood clots would have been formed even without the compression bandaging." (Doc. 42, Reply p. 4.)

Defendant's arguments, however, point out the issue of fact. The notes and comments of Dr. Ivy and Dr. Darden raise an issue of fact that the pressure bandage was a cause of the injury to Mr. Churchill's arm. Contrary to defendant's argument, the Court need not "draw a conclusion" as to the precise cause. The Court need only find an issue of fact as to an element. Here, the evidence that Dr. Ivy and Dr. Darden attributed some of the injury to the pressure bandage raises an issue of fact.

Further, Dr. Edmonds identifies a list of injuries, considered in the light most favorable to plaintiff, caused by the pressure bandage. Dr. Edmonds presents "diagnostic impressions" that, for instance, "status post venous extravasation causing recurrent swelling of the right upper extremity, producing delayed onset tourniquet-type effect caused by the patient's dressing." (Doc. 41-3, p. 19.) Considering this evidence in light most favorable to plaintiff, the evidence raises an issue of fact.

Defendant argues that this "list" of diagnostic impressions does not state that the nursing staff *breached* the standard of care. (Doc. 42, Reply p. 8.) Defendant argues that the IME report does not state that the VA nurses were negligent or that as a result of the negligence Mr. Churchill was injured. (Doc. 42, Reply p.8.)

Whether the nurses were "negligent" is the ultimate issue for the jury's determination based upon all of the evidence. Plaintiff has presented expert testimony as to each of the challenged elements in the medical malpractice cause of action.

**C.   Loss of Consortium**

Mrs. Churchill's claim for loss of consortium is derivative of Mr. Churchill's claim for medical

malpractice. Since the Court has found issues of fact for Mr. Churchill's claim, the motion as to Mrs. Churchill is denied.

## **CONCLUSION**

For the foregoing reasons, the Court DENIES Defendant's motion for summary judgment.

IT IS SO ORDERED.

**Dated:   May 6, 2011**                                     /s/ Lawrence J. O'Neill
                                                                           UNITED STATES DISTRICT JUDGE